IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DUSTIN AVORY SWAN,

    Plaintiff,

v.                                                                            Civil Action No. **3:22CV725**

BRIAN S. BURR,

    Defendants.

**MEMORANDUM OPINION**

Dustin Avory Swan, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action pursuant to 42 U.S.C. § 1983.[1] Mr. Swan alleges that Deputy Brian S. Burr used excessive force against his person "after he [was] handcuffed and in custody by stomping on my back, in which he fractured my T-7 and T-8 vertebrates in my spine." (ECF No. 5, at 4.) The matter is before the Court on Deputy Burr's Motion for Summary Judgment. (ECF No. 48.) Mr. Swan has responded. The Motion for Summary Judgment will be GRANTED.

**I. Procedural History**

Mr. Swan contends that Deputy Burr used excessive force against his person during the course of his arrest and subsequent detention. Previously, Deputy Burr moved for summary judgment and provided Mr. Swan with the notice required under Local Rule 7(K) and *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). (ECF No. 32.) Mr. Swan failed to respond to the Motion for Summary Judgment with any admissible evidence. Instead, Mr. Swan filed multiple motions requesting the issuance of a subpoena duces tecum to several non-parties wherein he sought, *inter alia*, his own medical records, Deputy Burr's medical records pertaining to the alleged use of

---

[1] The Court employs the pagination assigned by CM/ECF. The Court corrects the capitalization, punctuation, and spelling in the quotations from the parties' submissions.

excessive force, and Deputy Burr's service records with the King and Queen's Sheriff's Department. By Memorandum Order entered on August 22, 2024, the Court denied the Motion for Summary Judgment and the Motions for Subpoenas without prejudice. (ECF No. 44.)

Specifically, the Court explained:

> Nevertheless, "[a]ll civil discovery, whether sought from parties or nonparties, is limited in scope by Rule 26(b)(1) in two fundamental ways. First, the matter sought must be 'relevant to any party's claim or defense.' Fed. R. Civ. P. 26(b)(1). . . . [Second,] discovery must also be 'proportional to the needs of the case.'" *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 188–89 (4th Cir. 2019) (quoting Fed. R. Civ. P. 26(b)(1)). "A more demanding variant of the proportionality analysis therefore applies when determining whether, under Rule 45, a subpoena issued against a nonparty 'subjects a person to undue burden' and must be quashed or modified." *Id.* at 189 (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)). The Fourth Circuit explained:
>> On the benefit side of the ledger, courts should consider not just the relevance of information sought, but the requesting party's need for it. *See Wiwa v. Royal Dutch Petrol. Co.*, 392 F.3d 812, 818 (5th Cir. 2004). The information sought must likely (not just theoretically) have marginal benefit in litigating important issues. (We mean "marginal" in the economic sense that the information must offer some value over and above what the requesting party already has, not in the sense that a mere *de minimis* benefit will suffice.) Courts should also consider what information is available to the requesting party from other sources. *See* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2463.1, at 501–06 (3d ed. 2008). To that end, *the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation*—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena.
>
> *Id.* (emphasis added).
> Here, Swan has not explained why he cannot obtain the documents sought by subpoena duces tecum from Defendant Burr. Indeed, Defendant Burr has stated "he would be willing to provide [Swan with] the medical records associated with his contention that he suffered an injury at the hands of the Plaintiff." (ECF No. 40, at 3.)

(ECF No. 44, at 2–3.)

On September 20, 2024, Mr. Swan again filed a Motion for Subpoena Duces Tecum seeking: (1) Deputy Burr's medical records from VCU Health Tappahannock Hospital from

2

December 2, 2021; (2) Deputy Burr's medical records from VCU Urgent Care in Tappahannock; (3) Deputy Burr's service records from King and Queen Sheriff's Office; and, (4) Mr. Swan's medical records from the Middle Peninsula Regional Jail. (ECF No. 45, at 1–2.) Swan asserted:

> The documents cannot be obtained from another source except from the originating source. The reasoning is to obtain these documents from their source as not to allow counterfeit or contamination of the documents or have third party alterations of these documents that will be scrutinized under oath in a trial. It is also a more logical target for the subpoenas and most importantly the defendant has already filed opposition to these subpoenas.

(ECF No. 46, at 1–2.)

In response, Deputy Burr stated Mr. Swan "fails to articulate a reasonable justification why he cannot obtain medical records from Dep. Burr, when Dep. Burr continues to offer to produce them." (ECF No. 47, at 2.) Additionally, Deputy Burr noted that Mr. Swan's allegation that Deputy Burr would somehow alter the records is baseless and otherwise failed to explain why he needed the sought-for records. (*Id.*) Further, Mr. Swan failed to explain why he could not simply request his own medical records from the Middle Peninsula Regional Jail. Accordingly, by Memorandum Order entered April 15, 2025, the Court denied without prejudice Mr. Swan's Motion for Subpoena Duces Tecum. (ECF No. 53.) Further, the Court directed Deputy Burr to provide Mr. Swan with a copy of Deputy Burr's medical records within fifteen (15) days of the date of entry thereof. (*Id.* at 3.) Additionally, the Court stated that any further response to the Motion for Summary Judgment must be filed within thirty (30) days of the date of entry thereof. (*Id.*) On May 12, 2025, Mr. Swan acknowledged that he received a copy of Deputy Burr's medical records. (ECF No. 56.)

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

3

P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of his Motion for Summary Judgment, Deputy Burr submitted: his own declaration (ECF No. 49-1); the declaration of Lieutenant Barry Radden (ECF No. 49-2); the declaration of the office manager, Vickie Draine (ECF No. 49-3); records from the King and Queen County Sheriff's Office pertaining to the assault (ECF No. 49-4); Deputy Burr's body camera footage ("BC," ECF No. 49-5)[2]; and, the records from King and Queen County pertaining to Mr. Swan's convictions for possession of firearm by a felon and assault on a police officer (ECF Nos. 49-6 to -7).

Mr. Swan has submitted multiple responses.[3] Mr. Swan has submitted, *inter alia*, Deputy Burr's medical records, and records pertaining to Mr. Swan's arrest and criminal conviction. The Court refers to these documents by their CM/ECF designation. Additionally, Mr. Swan submitted a copy of Deputy Burr's body camera footage and footage from other police videos. (ECF No. 56; ECF No. 61-3.)

In light of the foregoing submissions, the following facts are established for purposes of the Motion for Summary Judgment.

---

[2] Because the Body Camera video has a series of numbered videos on it, the Court will refer to the Body Camera videos as BC1, BC2, etc.

[3] Mr. Swan's responses do not have a jurat indicating they were sworn before a notary. Instead, the documents were merely acknowledged before a notary. (*See, e.g.*, ECF No. 51, at 4; ECF No. 57, at 8.) An acknowledgment is used to verify a signature and to prove that an instrument was executed by the person signing it, whereas a jurat is evidence that a person has sworn as to the truth of the contents of the document. In an acknowledgment, unlike a jurat, the affiant does not swear under oath nor make statements under penalty of perjury. *See Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (explaining that jurat uses words "subscribed and sworn" and demonstrates an oath was administered); *Goode v. Gray*, No. 3:07cv189, 2009 WL 255829, at *2 n.6 (E.D. Va. Feb. 3, 2009). Thus, Mr. Swan's responses do not constitute admissible evidence.

5

## III. Summary of Relevant Facts

### A. Introductory Facts

In December of 2021, Mr. Swan had an outstanding felony warrant for grand larceny. (ECF No. 49-4, at 2.) On December 2, 2021, Deputy Burr was working as a deputy for the King and Queen County Sheriff's Office. (ECF No. 49-1 ¶¶ 1, 5.) That morning, Deputy Burr went to a residence at 130 Stratton Major Road, Shackleford, Virginia, to serve the felony arrest warrant on Mr. Swan. (*Id.* ¶ 5.) Deputy Burr was in uniform, and his badge was clearly displayed. (*Id.* ¶ 7.) Deputy Burr was carrying his Smith and Wesson M&P .45 service pistol on his left hip and had OC spray just in front of the firearm on his belt. (*Id.*) "The holster for the pistol had a two-level safety retention mechanism. The first level was a switch to release what is referred to as the bail. Once the bail is released, a second button must be pressed to permit the weapon to be drawn." (*Id.*)

> Upon arriving at the house, Deputy Burr activated his body camera. (*Id.* ¶ 6.)
>
> This device was worn on [his] left chest pocket and secured by a magnet mount to [his] shirt. The camera is a one-piece unit with the camera and recorder as one single unit. The camera recorded everything that [he] saw when it was activated. Upon activation, the Body Cam provided a visual recording of everything until it was deactivated. [He] also had a vehicle camera system that was mounted to [his] patrol vehicle. It records the prior 30 seconds of video upon activation. The Body Cam recorded all audio from the time of activation until the time of deactivation.

(*Id.*)

Upon arriving at the home, Deputy Burr made contact with a woman, "who indicated that Swan was present and located in the backyard with two other individuals. She requested that [Deputy Burr] not inform Swan that she told me where he was located due to fear of reprisal from him." (*Id.* ¶ 8.) Deputy Burr went through the house to the rear yard. (BC1 9:28:30–9:29:00.)

6

### B. Deputy Burr's Initial Interaction and Altercation with Mr. Swan

Upon arriving in the back yard, Deputy Burr found Mr. Swan

> seated in the driver's seat of a pick-up truck, and two other individuals were located outside of the truck with him. [Deputy Burr] informed Swan that [he] was there to serve him with an active warrant and take him into custody. He did not move from the driver's seat as [Deputy Burr] stood beside him with the door open. After approximately thirty-five seconds, [Deputy Burr] began to place him into handcuffs and grasped his left wrist. At that point he began to resist and actively fight [Deputy Burr].
> He did not move from the vehicle, failed to comply with [Deputy Burr's] commands, and began to tense his arms which [Deputy Burr] believed to be posturing before an altercation. Given [Mr. Swan's] agitated state, and the fact that [Deputy Burr] did not know if he was carrying a weapon, [Deputy Burr] reached out to place [Mr. Swan's] hands into handcuffs.

(ECF No. 49-1 ¶¶ 8, 9.)[4] Mr. Swan then lunged at Deputy Burr, and they fell to the ground. (*Id.* ¶ 10.) Mr. Swan reached towards his pocket and began to fight with Deputy Burr. (*Id.*) Deputy Burr was trying to break contact with Mr. Swan in order to get Mr. Swan's hand away from his pocket and behind his back. (*Id.*)

Deputy Burr had to use both his hands to keep Mr. Swan's away from his pocket. (*Id.* ¶ 11.) Deputy Burr repeatedly told Mr. Swan to stop resisting and place his hands behind his back. (*Id.*) Mr. Swan did not comply with that order. (*Id.*) "During this struggle, [Deputy Burr's] Body

---

[4] The body camera footage largely corroborates Deputy Burr's account. Deputy Burr informed Mr. Swan that he had a warrant for Mr. Swan and asked him to stand up. (BC1 9:29:51–59.) Mr. Swan asked if he could smoke a cigarette and Deputy Burr replied, "Yeah, I will let you do that." (*Id.* 9:30:00-02.) Deputy Burr then repeated his request for Mr. Swan to stand up. (*Id.* 9:30:03–05.) Mr. Swan nevertheless remained seated in his truck as Deputy Burr held out his cuffs and encouraged Mr. Swan that they were going to get it taken care of, that they would get before a magistrate, and he would be on his way. (*Id.* 9:30:05–42.) Mr. Swan repeated his request to smoke a cigarette, to which Deputy Burr responded, "I'm going to let you smoke a cigarette." (*Id.* 9:30:42–50.) At this point, Mr. Swan lunged at Deputy Burr, and they went to the ground after a brief struggle. (*Id.* 9:30:51–58.) Mr. Swan continued to struggle, and Deputy Burr continued to urge Mr. Swan to "cut it out man" and "knock it off," as he was "making this harder than it is supposed to be." (*Id.* 9:30:58–9:31:08) As Mr. Swan continued to struggle, Deputy Burr repeatedly ordered Mr. Swan to put his hands behind his back. (*Id.* 9:31:02–38.)

Cam was knocked off of [his] chest, but continued to record the sound from the encounter.[5] [Mr. Swan] then grasped [Deputy Burr's] thumb and bent it back to such an extreme angle that" it popped and placed Deputy Burr in significant pain. (*Id.*) Deputy Burr swears that at this time, he "feared for [his] safety and was unsure if [he] would survive this altercation with [Mr. Swan]." (*Id.*)

Deputy Burr was finally able to create separation from Mr. Swan by grasping one of his hands and placing himself on top of him. (*Id.* ¶ 12.) Deputy Burr

> quickly began assessing how to best subdue [Mr. Swan]. Given the proximity of people [Mr. Swan] knew, [Deputy Burr] reached down and unclipped [his] OC spray and deployed it into [Mr. Swan's] face. While [Deputy Burr] was attempting to deploy the OC Spray, [Mr. Swan] bit [Deputy Burr] on the hand. At this time, [Deputy Burr] asked [Mr. Swan] to stop resisting and he began to reach for his pocket. [Deputy Burr] repeatedly commanded [Mr. Swan] to stop resisting and place his hands behind his back which he refused to do.
> Due to [Mr. Swan's] erratic behavior, refusal to comply with [his] commands, and his assault[ive] behavior, [Deputy Burr] deployed [his] OC spray.

(*Id.* ¶¶ 12, 13.)

According to Deputy Burr, he "deployed [his] OC spray on [Mr. Swan] because [he] believed he could be a threat to the safety of [himself], other citizens, their property, or himself. [Deputy Burr] also did not want him to evade any criminal charges that were based on his active felony warrants from four jurisdictions." (*Id.* ¶ 14.)

Shortly thereafter, Deputy Burr was able to gain control of one of Mr. Swan's hands and place it into cuffs. (*Id.* ¶ 15.)

> [Mr. Swan] then complied, and [Deputy Burr] was able to place his other hand into restraints. One of the individuals that was present during the incident then picked up [Deputy Burr's] body worn camera and [Mr. Swan's] hat and returned the camera to [Deputy Burr]. [Deputy Burr] then radioed to the Sheriff's Office dispatch and reported that [he] had [Mr. Swan] in custody. The camera then shutoff

---

[5] On the sound recording, Mr. Swan's friends repeatedly urged him to "stop" and "relax." (BC1 9:32:00–20.)

8

> at approximately 9:33 a.m. [Deputy Burr] transported [Mr. Swan] to [his] vehicle in the front of the residence and placed him in the back seat. When [Deputy Burr] realized that the body worn camera had been deactivated, [he] turned it back on when [he] affixed it to [his] chest at approximately 9:36 a.m.

(*Id.* ¶ 15.) At no point did Deputy Burr strike Mr. Swan. (*Id.* ¶ 17.)[6] Deputy Burr further emphasizes that at no point did he strike Mr. Swan's back. (*Id.*)

### C. Placement in the Patrol Car and Transport to Sheriff's Office

After securing Mr. Swan in his police cruiser, Deputy Burr

> conducted a *Terry* search of [Mr. Swan's] person. At this time, approximately five and a half minutes after the altercation, [Deputy Burr] located a firearm and knife in the [Mr. Swan's] pockets. The firearm was located in the pocket that [Mr. Swan] was attempting to reach for while [Deputy Burr] was attempting to place him under arrest.

(*Id.* ¶ 18.) Deputy Burr then transported Mr. Swan to the Sheriff's Office in his patrol car. (*Id.* ¶ 16.) Deputy Burr informed radio dispatch that he had a broken thumb and that [Mr. Swan] would require assistance removing the OC spray from his face and body. (*Id.*) Deputy Burr swears:

> At no point during [his encounter with Mr. Swan] did [he] use any force or strike [Mr. Swan] after he was placed under arrest. [Mr. Swan] never stated he had any injuries from [the] encounter. The only concern he voiced were the requests to

---

[6] Mr. Swan alleges that after the body cam shut off at approximately 9:33 a.m. was when Deputy Burr assaulted him. Mr. Swan *alleges* at this point Deputy Burr turned

> the body cam off so that he can assault me. Pushing me to the ground, stomping, kicking and kneeing my back. Saying things like, "Don't you ever try to run from me" and "Damn you for making me hurt myself." Minutes later the body cam comes back on while I'm in the car, no[t] destroying the car, and I'm screaming because I'm in pain from the assault I had just received.

(ECF No. 57, at 6.) Mr. Swan has submitted no direct evidence for this version of events, though he has submitted medical records reflecting that he had a back injury, as discussed below.
The Court notes that body cam footage of Mr. Swan in the police cruiser shows Mr. Swan's friend grinning and laughing at Mr. Swan's predicament. (BC2 9:36:51–9:37:00.) This does not seem consistent with the reaction of someone who had just watched Deputy Burr viciously kick his incapacitated and handcuffed friend.

9

remove the OC spray from his eyes and face. During [the] return to Sheriff's Office, [Deputy Burr] rolled the window down in the [his] patrol vehicle to assist in relieving the discomfort from the OC spray.

(*Id.* ¶ 21.) Emergency Medical Technicians ("EMT") arrived at the Sheriff's Office and treated Deputy Burr for the thumb injury he suffered at the hands of Mr. Swan. (*Id.* ¶ 19.)

Upon arrival at the Sheriff's Office, Mr. Swan was taken into custody by Lt. Radden and was served the active warrants, as well as the new charges stemming from his assault on Deputy Burr and the recovery of the gun from his person. (*Id.* ¶ 20.) "At no point did Swan complain of any discomfort beyond the OC spray. Swan also made no indication that Dep. Burr had assaulted him either before or after he was detained. Swan also made no statement that Dep. Burr had stomped on his back or any words to that effect." (ECF No. 49-2 ¶ 8.)

Deputy Burr's medical records from December 6, 2021, reflect that he sought medical care for an injury to his right thumb. (ECF No. 57-1, at 7.) According to the medical record, the "[m]echanism of injury" was "falling." (*Id.*) The records further state, "[n]o acute fractures are identified." (*Id.* at 10.) The medical records further reflect that: "Patient has healed puncture wound on left dorsal surface of hand." (*Id.* at 9.)

Mr. Swan's medical records from January 6, 2022, state, "Xray shows T7 and T8 minor wedge fracture. By symptoms for last 1.5 month since altercation." (*Id.* at 12.) Mr. Swan's medical records from February 14, 2022, state:

> This is a 49-year-old male, referred for evaluation of recent x-ray findings of T7 and 8 compression fractures. . . . He describes a multiyear history of episodes of pain in the mid and lower thoracic area. He recalls severe pain after a motor vehicle accident several years ago. . . .
> He was arrested on December 2nd and was involved in an altercation with the officer. He reports that the officer threw him prone onto the ground and knelt on his mid back. He describes severe pain to the right side of the mid and lower thoracic area with significant muscle spasm in this area. . . .

10

> We have a report from an x-ray performed at the Middle Peninsula Security Center (January 11, 2022) documenting minor anterior wedge fracture T7 and T8 which appears chronic. . . .

(*Id.* at 13.)

### D. Mr. Swan's Subsequent Convictions

On July 13, 2022, in the Circuit Court for King and Queen County ("Circuit Court"), Mr. Swan pled guilty to possession or transport of a firearm after having been convicted of a violent felony. (ECF No. 49-7, at 5.) Additionally, Mr. Swan entered an *Alford*[7] plea with respect to charge of assault and battery of a law enforcement officer. (*Id.* at 5–6.) The Circuit Court sentenced Mr. Swan to an active sentence of seven years and six months. (ECF No. 49-6, at 5.)

## IV. Analysis

### A. Distinction Between Excessive Force Against Arrestees and Pretrial Detainees

"The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010)). Once, an individual is "'lawfully arrested and being held prior to a formal adjudication of guilt,' [that individual] is adjudged . . . to be a pretrial detainee. *Id.* (quoting *United States v. Cobb*, 905 F.2d 784, 788 (4th Cir. 1990)). "[T]he excessive force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment." *Id.* at 1166. Here, according to Mr. Swan in his Amended Complaint, Deputy Burr used excessive force against his person "after he [was] handcuffed and in custody by stomping on my back, in which he fractured my T-7 and T-8 vertebrates in my spine." (ECF No. 5, at 4.) This aspect of Mr. Swan's excessive force claim must be evaluated under the Fourteenth Amendment.

---

[7] *North Carolina v. Alford*, 400 U.S. 25 (1970).

11

*See Robles v. Prince George's County*, 302 F.3d 262, 268 (4th Cir. 2002) (citation omitted) (holding that "[o]nce the single act of detaining an individual has been accomplished, the [Fourth] Amendment ceases to apply.").

### B. Excessive Force Against Mr. Swan as a Pretrial Detainee

Allegations of excessive force against a pretrial detainee must be evaluated under the Due Process Clause of the Fourteenth Amendment. *See Goodman v. Barber*, 539 F. App'x 87, 89 (4th Cir. 2013) (citation omitted). A detainee must show that the defendant "inflicted unnecessary and wanton pain and suffering upon the detainee." *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (citations omitted) (internal quotation marks omitted), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). A detainee may prevail by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (citations omitted). The factors that a court may consider to determine whether force was objectively unreasonable may include:

> [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of [the detainee's] injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the [detainee] was actively resisting.

*Id.* at 397 (third and eighth alterations in original) (citing *Graham*, 490 U.S. at 396).

Here, Mr. Swan has submitted evidence that he sustained a back injury. However, there is no evidence that these back injuries are attributable to Deputy Burr stomping on Mr. Swan after he was handcuffed and detained. Rather, the evidence affirmatively refutes that assertion. Deputy Burr swears that after Mr. Swan was placed under arrest, he never struck Mr. Swan or used any force against his person. Given this record, which reflects that Deputy Burr did not use force

12

against Mr. Swan after he was arrested, Mr. Swan's excessive force claim under the Fourteenth Amendment must fail.

### C. Force Against Mr. Swan as an Arrestee

"[T]he Fourth Amendment's prohibition against unreasonable seizures" governs Mr. Swan's "claim of excessive force . . . and is to be analyzed under the Fourth Amendment reasonableness standard" announced in *Graham v. Connor*, 490 U.S. 386, 394 (1989). *Mazuz v. Maryland*, 442 F.3d 217, 230 (4th Cir. 2006), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 235 (2009). "The officer's actions do not amount to excessive force if they 'are objectively reasonable in light of the facts and circumstances confronting [him] . . . .'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (alteration in original) (quoting *Graham*, 490 U.S. at 397). When considering the "facts and circumstances of each . . . case," courts pay particular attention to the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). Courts "may also consider 'the extent of the plaintiff's injury' and 'any effort made by the officer to temper or to limit the amount of force.'" *Somers v. Devine*, 132 F.4th 689, 698 (4th Cir. 2025) (quoting *Kingsley*, 576 U.S. at 397). "Rather than viewing officers' actions as discrete events, a court should consider the events in their 'full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Pair v. Burroughs*, No. 3:15-CV-00776-JAG, 2016 WL 7197389, at *2 (E.D. Va. Dec. 9, 2016) (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).

Here, Deputy Burr's use of force against Mr. Swan was eminently reasonable. Deputy Burr was sent to 130 Stratton Major Road, Shacklefords, Virginia, to serve a felony arrest warrant on Mr. Swan for grand larceny. Neither Deputy Burr nor the record suggest the nature of this

crime caused him, or would cause an ordinary officer, to be particularly fearful for his safety. And the remaining relevant factors demonstrate that Deputy Barr's use of force was reasonable. Deputy Burr informed Mr. Swan that he needed to arrest him. Mr. Swan was visibly upset. Deputy Burr attempted to calm Mr. Swan down by agreeing to Mr. Swan's request to smoke a cigarette. Deputy Burr asked Mr. Swan to stand up. Mr. Swan refused.

When Deputy Burr attempted to place handcuffs on Mr. Swan, Mr. Swan lunged at Deputy Burr, and they fell to the ground. Mr. Swan then actively threatened Deputy Burr by attempting to reach for what Deputy Burr correctly perceived to be a weapon in his pocket. Yet, Deputy Burr did not strike or draw his service weapon. Instead, Deputy Burr merely tried to keep Mr. Swan's hand away from his pocket while repeatedly urging Mr. Swan to stop resisting and to place his hands behind his back. Mr. Swan ignored those commands and instead grabbed Deputy Burr's thumb and bent it back so far that it popped and caused him significant pain. By any measure, the force employed by Deputy Burr up to this point was restrained and objectively reasonable.

At this point, Deputy Burr reasonably concluded that additional force was necessary to subdue Mr. Swan. A reasonable officer in Deputy Burr's position would believe that Mr. Swan posed an imminent threat to his life. Additionally, an officer, with a now injured thumb, would reasonably perceive that his ability to simply wrestle Mr. Swan into submission was unlikely to occur before Mr. Swan either obtained the object in his pocket or Mr. Swan's friends intervened. Deputy Burr reasonably concluded that he needed to deploy OC spray to subdue Mr. Swan. After he deployed the OC spray, Deputy Burr was able to handcuff Mr. Swan. Mr. Swan fails to adduce evidence from which a jury could conclude that Deputy Burr used excessive force against his person.

## V. The Action Is Malicious

The courts are charged with dismissing an action proceeding in forma pauperis at any time during the course of the litigation that it becomes clear that the action is frivolous or malicious. 28 U.S.C. §§ 1915A, 1915(e)(2); *see also White v. Gregory*, 1 F.3d 267, 269 (4th Cir. 1993).[8] The courts have long recognized that inmate complaints against state officials are a particularly fertile arena for frivolous and malicious litigation. *Daye v. Bounds*, 509 F.2d 66, 68 (4th Cir. 1975) (cautioning the district courts to be particularly "diligent in acting to prevent state prisoners from calling upon the financial support of the federal government to prosecute frivolous civil suits intended to harass state prison officials."). This Court has previously stated:

> A litigant may be deemed to act maliciously if his actions "[i]mport a wish to vex, annoy, or injure another, or an intent to do a wrongful act, and may consist in direct intention to injure, or in reckless disregard of another's rights." BLACK'S LAW DICTIONARY, Special Fifth Ed. at 863 (1981). Therefore, "the court must assess the character of the allegations insofar as they indicate a motive on the part of the plaintiff to merely harass or vex the defendants rather than to seek redress for a legitimate legal claim." *Daves v. Scranton*, 66 F.R.D. 5, 7 (E.D. Pa. 1975) [(dismissing convicted rapist's conspiracy claim against his victim and prosecutors)]. After reviewing the sparse precedent and the legislative history of § 1915, Judge Larkins concluded:
>> when there is no recital of credible probative facts that support the allegations that the plaintiff is attempting to make, the Plaintiff sues those involved in securing his incarceration, and the tone of all the Plaintiff's allegations indicates that he is bringing his suit merely to satisfy his desire for vengeance against the Defendants and not to rectify any wrong done to him, then the suit is a MALICIOUS one.
>
> *Spencer*, 656 F. Supp. at 463–64. Furthermore, in ascertaining whether a particular action is malicious, the Court's review is not limited to the current complaint, but is guided by the plaintiff's past litigious conduct.

*Cain v. Com. of Va.*, 982 F. Supp. 1132, 1136 (E.D. Va. 1997) (citing *Cochran v. Morris*, 73 F.3d 1310, 1316–17 (4th Cir. 1996) (en banc)).

---

[8] This provision applies to actions dismissed at the summary judgment stage. *See Blakely v. Wards*, 738 F.3d 607, 612 (4th Cir. 2013), *as amended* (Oct. 22, 2013).

15

Mr. Swan pled guilty to assaulting Deputy Burr. Now, Mr. Swan asserts that Deputy Burr used excessive force against him. *See, e.g., Vaughan v. L.E.G.*, No. 3:22CV509 (DJN), 2022 WL 17363025, at *3 (E.D. Va. Dec. 1, 2022) (concluding that action was malicious when plaintiff sought "to sue the victim of the crimes which led to his current incarceration"). Mr. Swan advanced no evidence that this was so. Rather, the evidence reflects Mr. Swan attacked Deputy Burr and injured Deputy Burr's thumb. The video and audio evidence reflect that Mr. Swan was the aggressor throughout his interactions with Deputy Burr during the course of his arrest. Mr. Swan fails to acknowledge this fact in his submissions. Instead, Mr. Swan falsely asserted that he was the victim of unconstitutional force at the hand of Deputy Burr. The Court finds that Mr. Swan brought this action to vex and harass Deputy Burr "rather than to seek redress for a legitimate legal claim." *Daves*, 66 F.R.D. at 7. The action will be DISMISSED AS MALICIOUS.

## VI. Conclusion

The Motion for Summary Judgment, (ECF No. 48), will be GRANTED. Mr. Swan's claims will be DISMISSED. The action will be DISMISSED AS MALICIOUS.

An appropriate Order shall accompany this Memorandum Opinion.

Date: 19 August 2025
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge